Anthony DIMEO, III

v.

Tucker MAX

No. Civ.A. 06–1544.

United States District Court,
E.D. Pennsylvania.

May 26, 2006.

ogy evolves. *Pfizer,* 429 F.3d at 1377.

Matthew B. Weisberg, Prochniak Poet & Weisberg P.C., Morton, PA, for Anthony Dimeo, III.

Michael K. Twersky, Montgomery McCracken Walker and Rhoads LLP, Philadelphia, PA, for Tucker Max.

## MEMORANDUM

DALZELL, District Judge.

Tucker Max describes himself as an aspiring celebrity "drunk" and "asshole" who uses his Web site, www.tuckermax.com, to "share [his] adventures with the world."[1] Anthony DiMeo, III, who says he is an heir and co-owner of a large New Jersey blueberry farm, threw a New Year's Eve party this past December that, apparently, ended in a shambles. The paths of these two men converge on Max's Web site, which hosts a number of message boards that allow Internet users to post anonymous comments on different topics. One of those topics is DiMeo's New Year's Eve party.

DiMeo sues Max for six postings that he finds offensive. DiMeo does not allege that Max authored the posts. Rather, he claims that Max "through his [Web site] publishes defamatory statements aimed at Plaintiff. . . ." Comp. ¶ 5. DiMeo sues for defamation and for Max's alleged violation of 47 U.S.C. § 223(a)(1)(3), a criminal statute that prohibits anonymously using a

---

1. *See* Tucker Max Homepage, *at* http://www.tuckermax.com (last visited May 18, 2006).

telecommunications device to harass someone.

## I. *Factual and Procedural Background*

On December 31, 2005, Renamity, Anthony DiMeo's publicity firm, organized what turned out to be the New Year's Eve party from hell.[2] *See, e.g.,* Michael Klein, *Real Noisemaking Begins After New Year's Party Fracas,* Phila. Inquirer, Jan. 5, 2006, at E3 (hereinafter *"Real Noisemaking"*); *The Art of the Deal; An Artist's Paintings Are Stolen and Damaged at a New Year's Party Gone Terribly Wrong,* Phila. Weekly, Jan. 11, 2006, at 18; Michael Klein, *The Party's Very Much Over: Promoter Is Suing,* Phila. Inquirer, Jan. 19, 2006, at E3 (hereinafter *"Promoter Is Suing"*). Renamity first contracted with Athmane Kabir, owner of Le Jardin, a restaurant located in the Philadelphia Art Alliance gallery, to host 325 guests on New Year's Eve for a four-hour party with food and an open bar. *Real Noisemaking,* at E3. Twice as many people appeared. *Id.* When alcohol and food ran out well before midnight, attendees—who had paid $100 each—became disenchanted:

> The staid, sprawling landmark on Rittenhouse Square never saw such a ruckus. Patrons seeking food burst through doors leading into a dining room of Kabir's Le Jardin restaurant. Two mixed-media works on loan by Antonio Puri were stolen from museum walls. Sconces were torn. Someone tried to haul off the donations box. Kabir, fearing injuries, called police about 10:30 p.m.

*Id.* While the arrival of police dispersed the crowd, it did not dissipate its anger, which apparently needed an outlet.[3]

---

**2.** These facts place the postings at issue in proper context. On DiMeo's Web site, he describes Renamity as "specializing in.. VIP launch events and special event production." *See* Anthony DiMeo III Web site *at* http://www.anthonydimeo.com (last visited May 26, 2006).

**3.** This lawsuit is not the only one to emerge from the New Year's Eve fiasco. According to the *Philadelphia Inquirer,* on January 10, 2006, DiMeo sued Le Jardin for "misstatements." *Promoter Is Suing,* at E3. In that article, Le Jardin's attorney reported that his client would counter-sue. *Id.*

Neither DiMeo nor Max is a stranger to court proceedings. Last year, DiMeo sued *Philadelphia Weekly* and its former gossip columnist, Jessica Pressler, after Pressler parodied the holiday card DiMeo emailed to his friends and family. Josh Cornfield, *Party Heads to Court: Lawsuits in Works Over New Years's Eve Bash Gone Bad,* Philly Metro, *at* http://philly.metro.us/metro /local/article/Party_heads_to_court/765.html; Doron Taussig, *Here's What's Fun—You're Getting Served,* Philadelphia City Paper, *at* http://citypaper.net/articles/2005-03-03/fineprint.shtml [hereinafter Taussig]. The card displayed DiMeo posing next to a Christmas tree. Next to an image of the card that she displayed in her column, Pressler wrote, "In 2004, I learned that I am so amazing that I get off all day simply on the incredible feeling of being myself." Taussig.

Max's introduction to the court system occurred in 2003 when Katy Johnson, who was Miss Vermont in both 1999 and 2001, sued him. *See, e.g.,* Adam Liptak, *Internet Battle Raises Questions About Privacy and the First Amendment,* N.Y. Times, June 2, 2003, at A13. On his Web site, Max posted an article that "contained a long account of his relationship with Ms. Johnson, whom he portrayed, according to court papers, as vapid, promiscuous and an unlikely candidate for membership in the Sobriety Society [that she founded]." *Id.* Johnson's attorneys persuaded the Honorable Diana Lewis of the Circuit Court in West Palm Beach, Florida to enjoin Max—without service or a hearing—from writing about Johnson. *Id.* Judge Lewis's ruling, which one legal commentator called "not only a prior restraint of Max's speech activities, but one of remarkable breadth," sparked "a flurry of worldwide media attention." Stewart Harris, *A Tale of Two Sites and a Lawsuit: Injunction Against Web Site Owner Was the Legal Issue in Suit Over Sala-*

Enter Tucker Max, a Duke Law School graduate whose professed goal in life is "[t]o be a celebrity that gets paid to get drunk, act like an asshole, and get drunk some more." Tucker Max Personal Info, *at* http://www.tuckermax.com/archives/entries/personal_info.phtml (last visited May 18, 2006). His Homepage reports that he has achieved his second aspiration. *Id.* Max spends much of his time running www.tuckermax.com, which he often uses to post anecdotes about his life. Max's Web site also hosts a number of message boards, with several devoted to DiMeo's New Year's Eve party.

The posts on these message boards—many of them laden with vulgarity—fall into three categories. First, a number comment about DiMeo's event. One author, for example, under the pseudonym "Jerkoff", wrote, "So what happened? Just shitty planning? From the looks of it, they got way more people that [*sic*] they wanted, the crowd was nasty, and the bartenders were stoned." Def.'s Mot. to Dismiss Mem., Ex. I, at 2.

The second group of posts ridicules DiMeo. Noting an online photograph of DiMeo modeling,[4] for example, an author wrote:

When the fuck did he become a model? And what the fuck does the photographer say to him to get him to make that face?

OK Anthony, I have this ... this ... this brilliant idea. Hear me out now. I want you to make a face like you were getting fisted by an angry gorilla. Ok, now mold your face to what you think you would look like if a leper were about to take a shit in your mouth. WORK WITH ME. EXCELLENT!

*Id.* at 22.

The third category of posts expresses outright animosity toward DiMeo. One author wrote, for example, "What a douche-bag! This guy sounds like the type of pompous, pretentious jackass that I take great pleasure in giving reality checks to ... but often can't locate...." *Id.* at 45. Another poster wrote, "This guy is such a tool ... I am amazed he has not been beaten in the street." *Id.* at 57.

On or around March 10, 2006, DiMeo sued Max in the Court of Common Pleas of Philadelphia County. In the complaint, he objected to six posts that, he claimed, typify those about him on Max's message boards:

(1) "Maybe you should find your validation elsewhere ... preferably at the end of a magnum," Compl. ¶ 5.a;

(2) "I just wanted to let you know that I think that you are the biggest piece of shit I have ever heard of and I hope that you die soon," *id.* ¶ 5.b;

(3) "Now I know why Arlen Specter got invited to all those Renamity *Http://www.renamity.com/galary/birthdaybash/escf0009* parties! Could it be ... bribery of your local politician?" *id.* ¶ 5.c;

---

*cious Story,* Nat. L.J., July 28, 2003, at 19. On June 6, 2003, Max removed *that* case to federal court, filed a motion to dismiss, and filed a motion (endorsed by the American Civil Liberties Union) to dissolve the temporary injunction. *Id.* Shortly after Max's counter-attack, Johnson voluntarily dismissed her case. *Id.*

4. According to his Web site, DiMeo generates income by (a) helping to run his family's southern New Jersey blueberry farms, (b) acting, (c) managing Renamity, and (d) working as a wealth manager. *See* Anthony DiMeo III Web site, *at* http://www.anthonydimeo.com (last visited May 26, 2006). As a member of the Screen Actors Guild, DiMeo claims he has done "[c]ommercial print modeling." *Id.*

(4) "He's got a neat, nice little page there from which we can harass him," *id.* ¶ 5.d;

(5) "I can't believe no one has killed him yet," *id.* ¶ 5.e; and

(6) "You threw an absolutely disastrous party on New Year's Eve precipitated by false advertising and possible fraud," *id.* ¶ 5.f.

As noted before, DiMeo does not allege that Max wrote any of these himself, but only that Max "through his [Web site] publishes defamatory statements aimed at Plaintiff...." Comp. ¶ 5. Max does not dispute that he selects, removes, and alters posts on the message boards. *See, e.g.,* Def.'s Reply in Further Supp. of Mot. to Dismiss, at 2. Based on these allegations, DiMeo sues for defamation in Count One and, in Count Two, for Max's alleged violation of 47 U.S.C. § 223(a)(1)(3).[5]

On April 12, 2006, Max removed DiMeo's lawsuit to this Court.[6] About a week later, Max filed the instant motion to dismiss which DiMeo opposes. At the end of his response, DiMeo adds a one-sen-

tence request for leave to file an amended complaint.[7] We shall grant Max's motion, deny DiMeo's request for leave to amend, and dismiss this matter with prejudice.

## II. *Legal Analysis*

Under Fed.R.Civ.P. 12(b)(6), we may dismiss a complaint for "failure to state a claim upon which relief can be granted." In addition to taking all factual allegations as true, we must draw all reasonable inferences in plaintiff's favor. *See In re Warfarin Sodium Antitrust Litig.,* 214 F.3d 395, 397 (3d Cir.2000). Rule 12(b)(6) permits dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### 1. *Count One*

In Count One, DiMeo sues for defamation. The primary issue in this case is whether § 509 of the Communications Decency Act,[8] codified at 47 U.S.C. § 230,

---

5. Count Three is a claim for punitive damages. Because punitive damages are a legal remedy rather than a cause of action, we shall summarily dismiss it.

6. On April 24, 2006, DiMeo filed a petition to remand this matter back to the Court of Common Pleas. In an Order yesterday, we denied that frivolous petition. As DiMeo's action invokes a federal statute as a basis for relief, we have federal question jurisdiction. There seems to be no dispute that we also have diversity jurisdiction, as the parties are citizens of different states (DiMeo of Pennsylvania and Max of New York) and the amount in controversy exceeds $75,000.

7. DiMeo's response contained new factual allegations that we set forth in footnote 17, *infra.*

   Plaintiff's counsel requested the opportunity for additional briefing. We granted his request and permitted him to file a consolidated supplemental brief by noon on May 14, 2006. Curiously (in light of his request), about ten

minutes before that noon deadline, plaintiff's counsel faxed us a letter advising, "Plaintiff has decided to rest on his briefs already submitted." Thus, he declined to avail himself of the opportunity he himself requested.

8. Title V of the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (1996), is known as the "Communications Decency Act of 1996." Congress's main goal in enacting the CDA was to limit the exposure of minors to indecent material on the Internet. *See* Pub.L. No. 104–104, Title v. (1996); *see also* H.R.Rep. No. 104–458, at 81–91 (1996); S.Rep. No. 104–230, at 187–93 (1996); S.Rep. No. 104–23, at 9 (1995). Almost exactly ten years ago, this Court struck down part of the CDA, *see American Civil Liberties Union v. Reno,* 929 F.Supp. 824 (E.D.Pa.1996) (Sloviter, C.J., Buckwalter, and Dalzell, JJ.), *affirmed,* 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), but the Section at issue in this case, § 230, remains intact. Representatives Christopher Cox (R–Cal.) and Ron Wy-

bars this claim. 47 U.S.C. § 230(c)(1) states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." Because of a preemption clause in § 230(e)(3),[9] § 230(c)(1) overrides the traditional treatment of publishers under statutory and common law:

> The provision "precludes courts from entertaining claims that would place a computer service provider in a publisher's role," and therefore bars "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content."

*Green v. America Online*, 318 F.3d 465, 471 (3d Cir.2003) (quoting *Zeran v. America Online Inc.*, 129 F.3d 327, 330 (4th Cir.1997)).

Congress enacted § 230(c)(1) to advance two objectives. First, Congress wanted to promote the free exchange of information and ideas over the Internet. In specific statutory findings, Congress stressed that "[t]he Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." § 230(a)(3); *see also* § 230(a)(5) ("Increasingly Americans are relying on interactive media for a variety of political, educational, cultural and entertainment services."); § 230(a)(1) ("The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens."). In these findings Congress also took pains to emphasize that, "[t]he Internet and other interactive computer services have flourished, to the benefit of all Americans, *with a minimum of government regulation.*" § 230(a)(4) (emphasis added).

Congress believed that § 230(c)(1) would promote these ideals. With the number of Internet users reaching the hundreds of millions, the quantum of information conveyed through interactive computer agencies is staggering:

> The specter of tort liability in an area of such prolific speech would have an obvious chilling effect. It would be impossible for service providers to screen each of their millions of postings for possible problems. Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted.

*Zeran*, 129 F.3d at 331. In other words, absent federal statutory protection, interactive computer services would essentially have two choices: (1) employ an army of highly trained monitors to patrol (in real time) each chatroom, message board, and blog to screen any message that one could label defamatory, or (2) simply avoid such a massive headache and shut down these fora. Either option would profoundly chill Internet speech.[10]

___

den (D–Ore.) introduced § 230 as an amendment to the CDA. *See* 141 Cong. Rec. H8468–70 (Aug. 4, 1995).

**9.** That provision reads, "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

**10.** Interestingly, the *New York Times* reports that the Chinese employ 50,000 censors to watch the Internet for anything the state regards as offensive. *See* Howard W. French, *As Chinese Students Go Online, Little Sister Is Watching*, N.Y. Times, May 9, 2006 at A3.

Congress enacted § 230 to advance a second goal—to "encourage service providers to self-regulate the dissemination of offensive material over their services." *Id.* See also § 230(b)(4) ("It is the policy of the United States ... to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material."); 141 Cong. Rec. H8469–70 (Aug. 4, 1995) (statements of Reps. Cox, Wyden, and Barton); 141 Cong. Rec. H8469–72 (Aug. 4, 1995) (statements of Reps. Cox, Wyden, Lofgren, and Goodlatte).

Under pre-CDA jurisprudence, interactive service providers that removed offensive material from their sites risked liability. In *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710, at *3–4 (N.Y.Sup.Ct. May 24, 1995), for example, New York's Supreme Court held a service provider liable *because* it screened and edited messages posted on its bulletin boards. *Id.* This editorial activity, the court reasoned, rendered the provider a publisher for defamation purposes and thus subject to strict liability. *Id.*

Concerned that cases like *Stratton Oakmont* would discourage providers from screening offensive content on their own sites, Congress enacted § 230(c)(2)(A) to insulate them from liability for

> any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected.

47 U.S.C. § 230(c)(2)(A). Both the House and Senate emphasized that "[o]ne of the specific purposes of this section is to overrule *Stratton Oakmont v. Prodigy* and any

other similar decisions which have treated such providers and users as publishers or speakers of content that is not their own...." H.R.Rep. No. 104–458, at 194 (1996); S.Rep. No. 104–230, at 194 (containing same quote).

### a. *Application of § 230(c)(1)*

■ Three elements are required for § 230(c)(1) immunity. First, the defendant must be a provider or user of an "interactive computer service." Second, the asserted claims must treat the defendant as a publisher or speaker of information. Third, the challenged communication must be "information provided by another information content provider."

At the outset, DiMeo's defamation claim treats Max as the publisher or speaker of the six posts he finds offensive. DiMeo does not allege that Max wrote any of the posts. Instead, he claims only that Max "through his [Web site] publishes defamatory statements aimed at Plaintiff...." Comp. ¶ 5.

As to the first element, "interactive computer service" means, in relevant part, "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server ...." § 230(f)(2). Max's Web site "provide[s]" and definitely "use[s]" an "interactive computer service." Because it is a "service" that "enables computer access" by multiple users to a computer server, see 47 U.S.C. § 230(f)(2), Max's Web site is a "provider." *See Parker v. Google, Inc.*, 422 F.Supp.2d 492, 500–01 (E.D.Pa.2006) (holding that Google "provide[s]" an interactive computer service); *Carafano v. Metrosplash.com, Inc.*, 207 F.Supp.2d 1055, 1065–66 (C.D.Cal. 2002) (same for online matchmaking Web site), *aff'd*, 339 F.3d 1119 (9th Cir.2003); *Schneider v. Amazon.com, Inc.*, 108 Wash. App. 454, 31 P.3d 37, 39–41 (2001) (same

for Amazon.com). In any event, for Max's Web site to exist, it must access the Internet through some form of interactive computer service; otherwise, the public could not view it. Thus, his Web site is also the "user" of an interactive computer service. *See Batzel v. Smith*, 333 F.3d 1018, 1030 (9th Cir.2003) ("[T]o make its Web site available and to mail out the listserv, the Network *must* access the Internet through some form of 'interactive computer service.' ").

As for the last element, the posts must constitute "information provided by another information content provider." 47 U.S.C. § 230(c)(1). Under § 230(f)(3), "information content provider" means "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." Max did not create the anonymous posts. The posters authored them entirely on their own.

In the face of these inconvenient realities, DiMeo falls back on the position that, because Max can select which posts to publish and edits their content, he exercises a degree of editorial control that rises to the "development of information." *See*

Pl.'s Resp. to Def.'s Mot. to Dismiss & Pl.'s Mot. for Leave To Am. ("Pl.'s Resp."), at (unnumbered) 3. If "development of information" carried the liberal definition that DiMeo suggests, then § 230 would deter the very behavior that Congress sought to encourage. In other words, § 230(c)(1) would not protect services that edited or removed offensive material. Yet, as noted earlier, one of Congress's goals in enacting § 230 was to *promote* this kind of self-regulation. Thus, "development of information" must mean "something more substantial than merely editing portions of [content] and selecting material for publication." [11] *Batzel*, 333 F.3d at 1031; *see also Green v. America Online*, 318 F.3d 465, 471 (3d Cir.2003) (holding that § 230(c)(1) bars " 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content.") (quoting *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir.1997)).[12] Because DiMeo alleges that Max did no more than select and edit posts, we cannot consider him to be the "provider" of the "content" that DiMeo finds to be offensive.[13]

**11.** Also, if we interpreted "development" broadly, then few online publishers would receive § 230(c)(1) immunity for the simple reason that most "choose among proffered material and ... edit the material published while retaining [the material's] basic form and message." *Batzel*, 333 F.3d at 1031.

**12.** Several other cases are equally pertinent. *See Donato v. Moldow*, 374 N.J.Super. 475, 865 A.2d 711 (2005) (holding that bulletin board operator's selective editing, deletion, and re-writing of anonymously posted messages did not transform the board into an "information content provider"); *Carafano v. Metrosplash.com., Inc.*, 339 F.3d 1119, 1124 (9th Cir.2003) (noting that "so long as a third party willingly provides the essential published content, the interactive service provider

receives full immunity regardless of the specific editing or selection process"); *Ben Ezra, Weinstein, & Co. v. America Online, Inc.*, 206 F.3d 980, 985 (10th Cir.2000) (holding that editing and altering stock quotations authored by a third party does not transform a defendant into an "information content provider"); *Blumenthal v. Drudge*, 992 F.Supp. 44, 49–53 (D.D.C.1998) (holding that America Online was not an "information content provider" even though it had editorial control over content in an allegedly defamatory gossip column).

**13.** Our conclusion does not mean that the *author* of a defamatory statement escapes accountability. As the United States Court of Appeals for the Forth Circuit has pointed out, "While Congress acted to keep government

In sum, Max's Web site uses (and likely provides) an "interactive computer service." DiMeo seeks to treat Max as a publisher or speaker of information. And the six posts constitute "information provided by another information content provider." *See* 47 U.S.C. § 230(c)(1). Thus, the statute blocks DiMeo's defamation claim. *See* 47 U.S.C. § 230(e)(3).[14]

## 2. *Count Two*

In Count Two, DiMeo seeks to hold Max civilly liable under 47 U.S.C. § 223(a)(1)(c), a federal statute that criminalizes "utiliz[ing] a telecommunications device ... without disclosing [one's] identity and with intent to annoy, abuse, threaten, or harass any person ... who receives the communications." In his response to Max's motion to dismiss, DiMeo's attorney writes, "Plaintiff instantly requests this Honorable Court's Leave to Amend his Complaint to eliminate Count II as stated, without prejudice to incorporate same into Plaintiff's claim of Defamation, as well as Plaintiff's prospective new claims for Intention [*sic*] Infliction of Emotional Distress and Defendant's Civil Rico violation." Pl.'s Resp., at (unnumbered) 5. Linguistically challenging as this sentence is, we interpret it to mean that DiMeo's lawyer thinks he can, somehow, make Count Two viable.

■ At the threshold, DiMeo bases Count Two on a *criminal* statute, and he does not even try to show that § 223(a)(1)(3) provides a private right of action. *See Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) (setting forth four-part test to determine whether a private right of action exists), and more recent jurisprudence that applies even stricter approaches to implying private rights of action. *See, e.g., Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).

Even putting that threshold problem aside, Count Two would still fail for at least two other reasons. First, § 223(a)(1)(3) applies only to one who uses a telecommunications device "without disclosing [one's] identity." Here, however, DiMeo does not allege that Max failed to disclose his identity. Nor could he. Max's Web site—which hosts the message boards—is called "www.tuckermax.com," the message boards are called the "Tucker

regulation of the Internet to a minimum, it also found it to be the policy of the United States 'to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.' " *Zeran*, 129 F.3d at 330 (quoting 47 U.S.C. § 230(b)(5)).

14. It would also seem that, even putting aside the preemption issue, DiMeo's defamation claim would still not survive. Four of the six statements he challenges—numbered one, two, four, and five above—are expressions of opinion that cannot be proven true or false. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) ("[T]he *Bresler–Letter Carriers–Falwell* line of cases provides protection for statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual.") (quoting *Hustler Magazine v. Falwell*, 485 U.S. 46, 50,

108 S.Ct. 876, 99 L.Ed.2d 41 (1988)). These statements are constitutionally protected. As for the remaining two, under Pennsylvania law, a court must view allegedly defamatory statements "in context" to determine the " 'effect the [writing] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.' " *Savitsky v. Shenandoah Valley Pub. Corp.*, 389 Pa.Super. 176, 566 A.2d 901, 904 (1989) (citing *Baker v. Lafayette College*, 516 Pa. 291, 532 A.2d 399 (1987) and quoting *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 273 A.2d 899, 907 (1971)). After viewing the tuckermax.com message boards, which are read by people using screen names like "Jerkoff," "Drunken DJ," and "footinmouth," the intended audience could not mistake the site for the *New York Times*. In short, it palpably is not serious.

Max Message Boards," and Max himself posts messages in his own name.[15]

Second, § 223(a)(1)(c) applies only to one who "makes a telephone call or utilizes a telecommunications device." As Max obviously made no telephone call, DiMeo must fall back on the position that he "utilize[d] a telecommunications device." The problem with that reading is that in 47 U.S.C. § 223(h)(1)(B), Congress emphasized that the term "telecommunications device ... does *not* include an interactive computer service." (emphasis added). Because we earlier found that Max's Web site is an interactive computer service, § 223(a)(1)(3)—even if there were a private right of action—would be unavailing.

### 3. *Request to Amend*

As noted, DiMeo also requests leave to amend his complaint to add claims for "Intention [*sic*] Infliction of Emotional Distress and Defendant's Civil Rico violation." Pl.'s Resp., at (unnumbered) 5. As a preliminary matter, DiMeo was not required to seek leave to amend. Fed. R.Civ.P. 15(a) allows "[a] party [to] amend the party's pleading once as a matter of course at any time before a responsive pleading is served.... Otherwise a party may amend the party's pleading only by leave of court or by written consent of the

adverse party; and leave shall be freely given when justice so requires." Because a motion to dismiss is not a responsive pleading, see *Centifanti v. Nix,* 865 F.2d 1422, 1431 n. 9 (3d Cir.1989), DiMeo was not required to seek antecedent leave from us. Because he opted to do so, however, we will consider his request now. *See id.*

■■■ A court may deny leave when amendment would be futile.[16] *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (noting that a court may deny leave when faced with "futility of amendment"). An amendment would be futile when "the complaint, as amended, would fail to state a claim upon which relief could be granted." *In re NAHC, Inc. Securities Litig.,* 306 F.3d 1314, 1332 (3d Cir.2002) (quoting *In re Burlington Coat Factory,* 114 F.3d 1410, 1427 (3d Cir.1997)).

■■ Here, DiMeo's proposed amended complaint would fail to state a claim upon which relief could be granted. Like the defamation claim, his prospective intentional infliction claim would fall to 47 U.S.C. § 230(c)(1). Moreover, even accepting all of the new allegations he sets forth in his response to Max's motion to dismiss,[17] DiMeo cannot plead a viable civil

---

**15.** While we normally may not look outside the pleadings in resolving a motion to dismiss, we may consider documents that are "integral to or·explicitly relied upon" in the complaint. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997). Here, the entire·basis of the complaint is the www.tuckermax.com message board.

**16.** While we deny the motion on futility grounds, we also point out that DiMeo's lawyer failed to take the time to submit a memorandum of law, as required by Local R. Civ. P. 7.1(c) and Fed.R.Civ.P. 7(b)(1). This is even more baffling because we granted his request to submit a supplemental· brief, an opportunity that he then declined.

**17.** In his response, DiMeo alleges that:
   I. Max has "published statements" that (1) threaten violence and death to DiMeo, (2) allege that DiMeo is committing bribery, (3) claim that DiMeo is a homosexual, and (4) assert that DiMeo is promoting Renamity through false advertising and fraud, Pl.'s Resp., at (unnumbered) 1;
   II. Max has posted information about DiMeo and his family, to wit, (1) his aunt's and grandmother's private phone number, (2) his cousin's photograph, and (3) his own private contact information, *id.* at (unnumbered) 1–2;
   III. DiMeo and his family have received death threats and been "bombarded with criminally harassing phone calls," *id.* at (unnumbered) 2; and

RICO claim. To plead such a claim, one must, *inter alia,* allege that the defendant engaged in a "pattern" of racketeering activities. 18 U.S.C. § 1962. To have engaged in such a "pattern," Max must have committed at least two of the predicate crimes enumerated in 18 U.S.C. § 1961(1). *See* 18 U.S.C. § 1961(5). DiMeo does not even intimate that Max committed one of these offenses. While he does claim that Max criminally violated 18 U.S.C. § 223(a)(1)(3), see Pl.'s Resp., at (unnumbered) 4, that offense is not a RICO predicate. *See* 18 U.S.C. § 1961(1). Even if it were, as we explained above, Max did not commit it because (1) he disclosed his identity and (2) did not use the requisite "telecommunications device." *See* 47 U.S.C. § 223(h)(1)(B).

### III. *Conclusion*

As we noted the last time we discussed the CDA,

> Some of the dialogue on the Internet surely tests the limits of conventional discourse. Speech on the Internet can be unfiltered, unpolished, and unconventional, even emotionally charged, sexually explicit, and vulgar—in a word, "indecent" in many communities. But we should expect such speech to occur in a medium in which citizens from all walks of life have a voice.

*American Civil Liberties Union v. Reno,* 929 F.Supp. 824, 882 (E.D.Pa.1996).

There is no question that tuckermax.com could be a poster child for the vulgarity we had in mind in 1996. But as we added then, "[w]e should also protect the autonomy that such a medium confers to ordinary people as well as media magnates." *Id.* Here we do so by protecting the coarse

conversation that, it appears, never ends on tuckermax.com.

### ORDER

AND NOW, this 26th day of May, 2006, upon consideration of defendant's motion to dismiss (docket entry # 2), plaintiff's response and motion to amend (docket entry # 4–5), defendant's reply to the response opposing the motion to dismiss (docket entry # 8), and defendant's response in opposition to the motion to amend (docket entry # 7), and for the reasons enunciated in the accompanying memorandum of law, it is hereby ORDERED that:

1. The complaint is DISMISSED;

2. The motion to file an amended complaint is DENIED; and

3. The Clerk shall CLOSE this matter statistically.

### JUDGMENT

AND NOW, this 26th day of May, 2006, the Court having today granted defendant's motion to dismiss and denied plaintiff's motion for leave to file an amended complaint, it is hereby ORDERED that JUDGMENT IS ENTERED in favor of defendant Tucker Max and against plaintiff Anthony DiMeo, III.

---

IV. DiMeo "lives in constant fear for his safety and the safety of his loved ones, has sought related psychological counseling, and has suffered the loss of his privacy, as well as the commercial ramifications that intuitively would arise from his public relations company being cast in the spot-light of public ridicule," *id.*