[952 NE2d 1011, 929 NYS2d 19]

CHRISTAKIS SHIAMILI, Individually and on Behalf of ARDOR REALTY CORP., Appellant, v THE REAL ESTATE GROUP OF NEW YORK, INC., et al., Respondents.

Argued May 2, 2011; decided June 14, 2011

## POINTS OF COUNSEL

*The Shapiro Firm, LLP,* New York City (*Jonathan S. Shapiro* and *Robert J. Shapiro* of counsel), for appellant. I. The First Department overlooked relevant facts and misapplied the Communications Decency Act when it found that defendant-respondents were simply "publishers" of the defamatory content and, as such, were entitled to immunity. (*Leon v Martinez,* 84 NY2d 83; *Rovello v Orofino Realty Co.,* 40 NY2d 633; *Fair Hous. Council of San Fernando Val. v Roommates.Com, LLC,* 521 F3d 1157; *Universal Communication Sys., Inc. v Lycos, Inc.,* 478 F3d 413; *Federal Trade Commn. v Accusearch Inc.,* 570 F3d 1187; *Carafano v Metrosplash.com. Inc.,* 339 F3d 1119; *Chicago Lawyers' Comm. For Civ. Rights Under The Law, Inc. v Craigslist, Inc.,* 461 F Supp 2d 681; *Batzel v Smith,* 333 F3d 1018, 541 US 1085; *Parker v Google, Inc.,* 422 F Supp 2d 492; *Green v America Online [AOL],* 318 F3d 465, 540 US 877.) II. The First Department erred in dismissing plaintiff-appellant's complaint prediscovery, where the complaint raised a sufficient inference that defendants-respondents were responsible for authoring and/or developing the defamatory material. (*Stendig, Inc. v Thom Rock Realty Co.,* 163 AD2d 46; *Integrated Logistics Consultants v Fidata Corp.,* 131 AD2d 338; *Simpson v Term Indus.,* 126 AD2d 484; *Baron v Incorporated Vil. of Freeport,* 143 AD2d 792; *Colicchio v Port Auth. of N.Y. & N.J.,* 246 AD2d 464.)

*Ford Marrin Esposito Witmeyer & Gleser, L.L.P.,* New York City (*Joseph D'Ambrosio, Andrew I. Mandelbaum* and *John Mattoon* of counsel), for respondents. I. On a motion to dismiss pursuant to CPLR 3211, pleadings are afforded a liberal construction. (*Edwards v Codd,* 59 AD2d 148; *Herzog v Town of Thompson,* 216 AD2d 801; *Lancaster v Colonial Motor Frgt. Line,* 177 AD2d 152; *NCAS Realty Mgt. Corp. v National Corp.*

*for Hous. Partnerships*, 241 AD2d 541; *Dillon v City of New York*, 261 AD2d 34; *People v Kin Kan*, 78 NY2d 54; *Zeran v America Online, Inc.*, 129 F3d 327, 524 US 937.) II. The claims are barred by the Communications Decency Act. (*Zeran v America Online, Inc.*, 129 F3d 327, 524 US 937; *Carafano v Metrosplash.com. Inc.*, 339 F3d 1119; *Batzel v Smith*, 333 F3d 1018; *Ben Ezra, Weinstein, & Co., Inc. v America Online Inc.*, 206 F3d 980; *Chicago Lawyers' Comm. For Civ. Rights Under The Law, Inc. v Craigslist, Inc.*, 461 F Supp 2d 681; *DiMeo v Max*, 433 F Supp 2d 523; *Green v America Online [AOL]*, 318 F3d 465; *Blumenthal v Drudge*, 992 F Supp 44; *Reit v Yelp!, Inc.*, 29 Misc 3d 713; *Gucci Am., Inc. v Hall & Assoc.*, 135 F Supp 2d 409.) III. Plaintiff's alleged need for additional discovery is not a basis to deny defendants' motion to dismiss. (*Fair Hous. Council of San Fernando Val. v Roommates.Com, LLC*, 521 F3d 1157; *Batzel v Smith*, 333 F3d 1018; *Bell Atlantic Corp. v Twombly*, 550 US 544; *Walsh v Liberty Mut. Ins. Co.*, 289 AD2d 842; *Matter of Greenbaum v Google, Inc.*, 18 Misc 3d 185; *Doe v MySpace, Inc.*, 528 F3d 413; *Chicago Lawyers' Comm. For Civ. Rights Under The Law, Inc. v Craigslist, Inc.*, 461 F Supp 2d 681.)

### OPINION OF THE COURT

CIPARICK, J.

On this appeal, we consider for the first time whether a plaintiff's claim against a Web site operator arising out of allegedly defamatory comments posted to the Web site is barred by the Communications Decency Act (CDA), codified at 47 USC § 230. We conclude that it is, and that the defendants' motion to dismiss the complaint was properly granted.

As stated in the complaint, plaintiff Christakis Shiamili is the founder and CEO of Ardor Realty Corp. (Ardor), a New York apartment rental and sales company. In March 2008, Shiamili filed this action for defamation and unfair competition by disparagement against defendants The Real Estate Group of New York, Inc. (TREGNY), Daniel Baum, and Ryan McCann. TREGNY is a competitor of Ardor's, also engaged in selling and renting New York City apartments; Baum is TREGNY's principal and chief operating officer; and McCann is Baum's assistant.

These defendants allegedly "administer and choose content for" a publicly accessible Web site—a "blog"—dedicated to the

New York City real estate industry.[1] In February 2008, defendants allegedly published defamatory statements about Shiamili on the Web site. Specifically, a lengthy comment was added to a discussion thread by a user operating under the pseudonym "Ardor Realty Sucks." The comment made several allegedly defamatory statements suggesting that Shiamili mistreated his employees and was racist and anti-Semitic, referring to one of the company's agents as "his token Jew." McCann, in his role as Web site administrator, moved the comment to a stand-alone post, prefacing it with the statement that "the following story came to us as a . . . comment, and we promoted it to a post." The post was given the heading, "Ardor Realty and *Those* People," and the subheading, "*and now it's time for your weekly dose of hate, brought to you unedited, once again, by 'Ardor Realty Sucks'. and for the record, we are* **so. not. afraid.**" The post was accompanied by a traditional image of Jesus Christ with Shiamili's face and the words "Chris Shiamili: King of the Token Jews."

Several of the comments posted by anonymous users in the ensuing discussion thread contained further allegedly defamatory statements, including suggestions that Ardor was in financial trouble and that Shiamili abused and cheated on his wife. One of the commentators ended by saying "call me a Liar and I'll come back here and get REALLY specific." The complaint alleges that McCann, under a pseudonym, responded, "liar" in an attempt to encourage the user to say more, but that commentator did not post further. Shiamili responded by drafting a lengthy comment, which was added to the discussion thread. Shiamili also contacted McCann and requested that he remove the defamatory statements, but McCann refused to do so.

Shiamili brought this action, alleging in his complaint that the defamatory statements were made with the intent to injure his reputation, and that defendants either "made" or published the statements. In addition to damages, the complaint requests injunctive relief requiring defendants to stop "publication of any and all defamatory statements concerning Shiamili and Ardor" and "any further disparagement."

---

1. Defendants maintain that only McCann administers the Web site. On this motion to dismiss, we accept plaintiff's allegation that "all McCann's actions . . . were taken with the knowledge of or acquiescence by" the other defendants.

Defendants moved to dismiss the complaint for failure to state a cause of action (CPLR 3211 [a] [7]). In support of the motion, McCann submitted an affidavit acknowledging that he was the "administrator and moderator" of the Web site, which "functioned as a virtual bulletin board, or open discussion forum" to which anyone could add content in the form of a comment on an existing post. Only McCann, in his role as moderator, could create stand-alone posts capable of generating their own discussion threads.

Supreme Court denied the motion to dismiss. As relevant here, it found that section 230 (c) (1) of the CDA (47 USC § 230 [c] [1]) did not require dismissal of plaintiff's claims, since "information as to defendants' role, if any, in authoring or developing the content of the website is exclusively within their possession" and discovery had not yet occurred (2008 NY Slip Op 33479[U], *7).

The Appellate Division unanimously reversed, granted the motion to dismiss, and dismissed the complaint. The court explained that the CDA protects Web site operators from liability derived from the exercise of a publisher's traditional editorial functions (see Shiamili v Real Estate Group of N.Y., Inc., 68 AD3d 581, 583 [1st Dept 2009]). Because the complaint here does not allege that defendants authored the defamatory content, but only that they published and edited it, the court concluded that the CDA bars Shiamili's claim and that further discovery is unnecessary (see id.). We granted Shiamili leave to appeal (15 NY3d 705 [2010]) and now affirm.

■ Although a publisher of defamatory material authored by a third party is generally subject to tort liability, Congress has carved out an exception for Internet publication by enacting section 230 of the CDA, passed as part of the Telecommunications Act of 1996 (Pub L 104-104, 110 US Stat 56 [104th Cong, 2d Sess, Feb. 8, 1996]). Section 230 establishes that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider" (47 USC § 230 [c] [1]), and it preempts any state law—including imposition of tort liability—inconsistent with its protections (see 47 USC § 230 [e] [3]). A defendant is therefore immune from state law liability if (1) it is a "provider or user of an interactive computer service"; (2) the complaint seeks to hold the defendant liable as a "publisher or speaker"; and (3) the action is based on "information provided by another information content provider" (47

USC § 230 [c] [1]; *see also Federal Trade Commn. v Accusearch Inc.*, 570 F3d 1187, 1196 [10th Cir 2009]; *Barnes v Yahoo!, Inc.*, 570 F3d 1096, 1100-1101 [9th Cir 2009]; *Universal Communication Sys., Inc. v Lycos, Inc.*, 478 F3d 413, 418 [1st Cir 2007]). The statute defines an "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service" (47 USC § 230 [f] [3]).[2]

In passing section 230, Congress acknowledged that "[t]he Internet . . . offer[s] a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity" (47 USC § 230 [a] [3]), and that it has "flourished, to the benefit of all Americans, with a minimum of government regulation" (47 USC § 230 [a] [4]). Further, "[i]t is the policy of the United States . . . to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation" (47 USC § 230 [b] [2]). As the Fourth Circuit explained in the seminal case of *Zeran v America Online, Inc.* (129 F3d 327, 330 [1997]):

> "Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium. The imposition of tort liability on service providers for the communications of others represented, for Congress, simply another form of intrusive government regulation of speech. Section 230 was enacted, in part, to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum."

Additionally, section 230 was designed "to encourage service providers to self-regulate the dissemination of offensive material over their services" (*id.* at 331). In this respect, the statute was a response to cases such as *Stratton Oakmont, Inc. v Prodigy Servs. Co.* (1995 WL 323710, 1995 NY Misc LEXIS 229 [Sup Ct, Nassau County 1995]), in which an Internet service provider was found liable for defamatory statements posted by third parties because it had voluntarily screened and edited some

---

2. Section 230 defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server" (47 USC § 230 [f] [2]).

offensive content, and so was considered a "publisher" (*see* 1995 WL 323710 at \*4, 1995 NY Misc LEXIS 229 at \*10-11; S Rep 104-230, 104th Cong, 2d Sess, at 194). Section 230 (c) (1) was meant to undo the perverse incentives created by this reasoning, which effectively penalized providers for monitoring content (*see Zeran*, 129 F3d at 331). Thus, section 230 has "two parallel goals. The statute is designed at once 'to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material' " (*Barnes*, 570 F3d at 1099-1100, quoting *Carafano v Metrosplash.com. Inc.*, 339 F3d 1119, 1122 [9th Cir 2003]).

Both state and federal courts around the country have "generally interpreted Section 230 immunity broadly, so as to effectuate Congress's 'policy choice . . . not to deter harmful online speech through the . . . route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages' " (*Universal Communication Sys.*, 478 F3d at 418, quoting *Zeran*, 129 F3d at 330-331; *see also Johnson v Arden*, 614 F3d 785, 791 [8th Cir 2010] ["The majority of federal circuits have interpreted the CDA to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service" (internal quotation marks omitted)]; *Doe v MySpace, Inc.*, 528 F3d 413, 418 [5th Cir 2008] ["Courts have construed the immunity provisions in (section) 230 broadly in all cases arising from the publication of user-generated content"]; *Barrett v Rosenthal*, 40 Cal 4th 33, 46, 146 P3d 510, 518 [2006] [noting that a broad reading of section 230 (c) (1) immunity has been "accepted, in both federal and state courts"]; *Doe v America Online, Inc.*, 783 So 2d 1010, 1013, 26 Fla L Wkly S141 [2001] [adopting the reasoning in *Zeran*]). New York trial courts have also taken this view (*see Reit v Yelp!, Inc.*, 29 Misc 3d 713, 716 [Sup Ct, NY County 2010]; *Kuersteiner v Schrader*, 2008 NY Slip Op 33614[U] [Sup Ct, NY County 2008]).

We have not yet had occasion to address the scope of section 230's protections. In *Lunney v Prodigy Servs. Co.* (94 NY2d 242 [1999]), we took note of the Fourth Circuit's opinion in *Zeran* and its robust understanding of CDA immunity as encompassing both publisher and distributor liability, but we left the decision whether to adopt that interpretation for another day (*id.* at 251). Today, we follow what may fairly be called the national consensus (*see Barrett*, 40 Cal 4th at 46 n 9, 146 P3d at 518 n 9

[citing cases]) and read section 230 as generally immunizing Internet service providers from liability for third-party content wherever such liability depends on characterizing the provider as a "publisher or speaker" of objectionable material.

Consistent with this view, we read section 230 to bar "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content" (*Zeran*, 129 F3d at 330; *see also Barnes*, 570 F3d at 1102 ["publication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content"]). Notably, the statute does not differentiate between "neutral" and selective publishers (*see e.g. Batzel v Smith*, 333 F3d 1018, 1031 [9th Cir 2003] ["the exclusion of 'publisher' liability necessarily precludes liability for exercising the usual prerogative of publishers to choose among proffered material and to edit the material published while retaining its basic form and message"]; *Blumenthal v Drudge*, 992 F Supp 44, 52 [D DC 1998] ["Congress has made a . . . policy choice by providing immunity even where the interactive service provider has an active, even aggressive role in making available content prepared by others"]).

Service providers are only entitled to this broad immunity, however, where the content at issue is provided by "another information content provider" (47 USC § 230 [c] [1]). It follows that if a defendant service provider is itself the "content provider," it is not shielded from liability (*see e.g. Nemet Chevrolet, Ltd. v Consumeraffairs.com, Inc.*, 591 F3d 250, 254 [4th Cir 2009]; *Fair Hous. Council of San Fernando Val. v Roommates.Com, LLC*, 521 F3d 1157, 1162 [9th Cir 2008]; *Universal Communication Sys.*, 478 F3d at 419). Since a content provider is any party "responsible . . . in part" for the "creation or development of information" (47 USC § 230 [f] [3]), any piece of content can have multiple providers.

It may be difficult in certain cases to determine whether a service provider is also a content provider, particularly since the definition of "content provider" is so elastic, and no consensus has emerged concerning what conduct constitutes "development":

> "[T]he broadest sense of the term 'develop' could include the functions of an ordinary search engine— indeed, just about any function performed by a website. But to read the term so broadly would defeat

the purposes of section 230 by swallowing up every bit of the immunity that the section otherwise provides. At the same time, reading the exception for co-developers as applying only to content that originates entirely with the website . . . ignores the words 'development . . . in part' in the statutory passage" (*Roommates.Com*, 521 F3d at 1167).

The Ninth's Circuit's approach, which Shiamili asks us to adopt, is to "interpret the term 'development' as referring not merely to augmenting the content generally, but to materially contributing to its alleged unlawfulness" (*id.* at 1167-1168). This view, which has been cited with approval by the Tenth Circuit (*see Accusearch Inc.*, 570 F3d at 1200), considers a Web site a content provider "if it contributes materially to the alleged illegality of the conduct" (*Roommates.Com*, 521 F3d at 1168).

In the case before us, we need not decide whether to apply the Ninth Circuit's relatively broad view of "development" since, even under that court's analysis, Shiamili's claim fails. Although the statements at issue are unquestionably offensive and obnoxious, defendants are nonetheless shielded from liability by section 230. Shiamili does not dispute that defendants, as alleged Web site operators, are providers of an "interactive computer service" under section 230 (*see Roommates.Com*, 521 F3d at 1162 n 6 ["the most common interactive computer services are websites"]; *Universal Communication Sys.*, 478 F3d at 419 ["web site operators . . . are providers of interactive computer services within the meaning of Section 230"]). Further, the claims here—defamation and unfair competition by disparagement—clearly seek to hold the defendants liable as publishers and speakers. The remaining question is whether, taking the facts alleged in the complaint as true, the defamatory statements were "provided by another information content provider" (47 USC § 230 [c] [1]).

■ As an initial matter, the complaint alleges that the defamatory statements were first posted by anonymous users; there is no allegation that defendants actually authored the statements. A Web site is generally not a "content provider" with respect to comments posted by third-party users (*see DiMeo v Max*, 248 Fed Appx 280, 282 [3d Cir 2007]). We reject Shiamili's contention that defendants should be deemed content providers because they created and ran a Web site which implicitly encouraged users to post negative comments about the New York City real estate industry. Creating an open forum for third parties to

post content—including negative commentary—is at the core of what section 230 protects (*see Accusearch Inc.*, 570 F3d at 1195 [noting that online message boards are "(t)he prototypical service qualifying for (section 230) immunity"]).

Moreover, there is no allegation that the defamatory comments were posted in response to any specific invitation for users to bash Shiamili or Ardor (*cf. Doctor's Assoc., Inc. v QIP Holder LLC*, 2010 WL 669870, 2010 US Dist LEXIS 14687 [D Conn 2010]). Evidence submitted by Shiamili in opposition to defendants' motion to dismiss indicates that the Web site had been operating for over a year before any of the comments that are the subject of this lawsuit were posted, and that the posted commentary spanned a range of topics. Even assuming that solicitation can constitute "development," this is plainly not a case where the Web site can be charged with soliciting the defamatory content at issue. Nor can it be said that McCann's attempt at provoking further commentary in the Shiamili discussion thread is actionable, since none followed.

The defendants did not become "content providers" by virtue of moving one of the comments to its own post. Reposting content created and initially posted by a third party is well within "a publisher's traditional editorial functions" (*Zeran*, 129 F3d at 330). Indeed, this case is analogous to others in which service providers have been protected by section 230 after reposting or otherwise disseminating false information supplied by a third party. To cite only a few examples, in *Ben Ezra, Weinstein, & Co., Inc. v America Online Inc.* (206 F3d 980 [10th Cir 2000]) the defendant service provider would publish updated securities information supplied by third parties and derived from a variety of stock exchanges and markets. Plaintiff sued the provider for publishing inaccurate information concerning the price and share volume of plaintiff's stock. The Tenth Circuit found that the inaccurate information was "created" by third parties, and the Web provider was not "responsible, in whole or in part, for [its] creation and development" (*id.* at 986). The Ninth Circuit reached the same result in *Batzel* (333 F3d 1018), cited with approval in *Roommates.Com* (521 F3d at 1170). There, the editor of an e-mail newsletter received a tip and incorporated it into the newsletter, adding a headnote. The tip proved false, but the Ninth Circuit found that section 230 protected the editor from being sued for libel because he had been "merely editing portions of an e-mail and selecting material for publication" (*Batzel*, 333 F3d at 1031). Similarly, in

*DiMeo* (248 Fed Appx at 281)—a case quite like this one—the plaintiff sued for defamation based on comments left by anonymous users on defendant's Web site, where defendant could "select which posts to publish and edit[ed] their content" (*DiMeo v Max*, 433 F Supp 2d 523, 530 [ED Pa 2006]). The Third Circuit found that "the website posts . . . constitute information furnished by third party information content providers" (248 Fed Appx at 282).

Shiamili argues that this case fits within a line of federal decisions in which courts have found that "even if the data are supplied by third parties, a website operator may still contribute to the content's illegality and thus be liable as a developer" of the content (*Roommates.Com*, 521 F3d at 1171; *see also Accusearch Inc.*, 570 F3d at 1199). Those cases, however, are easily distinguishable. In *Roommates.Com*, the nonparties providing the data were required to post actionable material to the defendant Web site as a condition of use, and the Web site's "work in developing the discriminatory questions, discriminatory answers and discriminatory search mechanism [was] directly related to the alleged illegality of the site" (521 F3d at 1172). Here, in contrast, there are no allegations that posting false and defamatory content was a condition of use, or that the site worked with users to develop the posted commentary. This case also differs considerably from *Accusearch Inc.*, where the defendant Web site paid researchers to obtain information for the site to disseminate that "would almost inevitably require [the researcher] to violate the Telecommunications Act or to circumvent it by fraud or theft" (570 F3d at 1192). There is no comparable allegation against these defendants.

■ Defendants appear to have been "content providers" with respect to the heading, subheading, and illustration that accompanied the reposting. That content, however, is not defamatory as a matter of law. The complaint does not allege that the heading and subheading are actionable, but only that they "preceded" and "prefaced" the objectionable commentary. The illustration that accompanied the post is alleged to be a "false and defamatory statement[ ] of fact," but all it states is that Shiamili is "King of the Token Jews." This is not a defamatory statement, since no "reasonable reader could have concluded that [it was] conveying facts about the plaintiff" (*Gross v New York Times Co.*, 82 NY2d 146, 152 [1993] [internal quotation marks and some brackets omitted]). The illustration was obviously satirical and, although offensive, it cannot by itself

support Shiamili's claim of defamation. Nor, contrary to the dissent's view, does it "develop" or "contribute[ ] materially to the alleged illegality" of the third-party content within the meaning of the CDA (dissenting op at 294).

Simply put, the complaint alleges that defamatory statements were posted on defendants' Web site, and some of them were reposted by the defendants. These statements are all "information provided by another information content provider" (47 USC § 230 [c] [1]). Defendants' added headings and illustration do not materially contribute to the defamatory nature of the third-party statements. Shiamili has therefore failed to state a viable cause of action against defendants, as his claims for defamation and unfair competition by disparagement are clearly barred by the CDA and were properly dismissed below.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

Chief Judge LIPPMAN (dissenting). It is unfortunate that in this, our first case interpreting the Communications Decency Act (CDA) (47 USC § 230), we have shielded defendants from the allegation that they abused their power as Web site publishers to promote and amplify defamation targeted at a business competitor. Even in the muted form in which the majority presents them, the allegations concerning the Web site operator's material contributions to the scurrilous defamatory attacks against Mr. Shiamili and Ardor Realty are sufficiently stated and are outside the scope of CDA immunity.

Plaintiff alleged that defendants published defamatory content, which claimed, in vulgar terms, that plaintiff was a racist and anti-Semite who mistreated his employees, could not retain real estate agents, failed to pay office bills, beat up his wife, and used his office space to commit adultery with prostitutes.* The allegedly defamatory statements included the following: "I have personally heard [plaintiff] making derogatory comments about [various ethnic groups]. He calls them 'those people,' etc. He has even said he keeps [his main listing agent] around only because he is Jewish, and this is how he gets 'those' landlords . . . [Plaintiff] has called him his token Jew."

If the complaint alleged that defendants merely reposted these outrageous statements to a more prominent position on the

---

\* We must deem the allegations of the complaint to be true in considering defendants' CPLR 3211 (a) (7) motion to dismiss.

Web site, this could plausibly be considered an exercise of "a publisher's traditional editorial functions" (*Zeran v America Online, Inc.*, 129 F3d 327, 330 [4th Cir 1997], *cert denied* 524 US 937 [1998]). But, the allegations of defendants' actions here are not so benign.

According to the complaint, defendants not only moved the defamatory comments to an independent post entitled "Ardor Realty and *Those* People," but embellished the comment thread by attaching a large, doctored photograph of plaintiff depicted as Jesus Christ, with the heading: "Chris Shiamili: King of the Token Jews." The defamatory statements were "preceded by an editor's note, on information and belief written and published by [defendant] McCann, that 'the following story came to us as a long . . . comment, and we promoted it to a post.' " McCann also allegedly introduced the post with the statements: " '[A]nd now it's time for your weekly dose of hate' and 'for the record, we are **so. not. afraid.**' "

The majority is anxious to trivialize the religiously charged illustration as "obviously satirical" and "not a defamatory statement, since no 'reasonable reader could have concluded . . . [it was] conveying facts about the plaintiff' " (majority op at 292 [citation omitted]). Of course, a reasonable reader would not have gathered from this digitally edited photograph that defendants were asserting that plaintiff was in fact Jesus Christ or the king of "token" Jewish real estate agents. But a reasonable reader, viewing the heading and illustration, might very well have concluded that the site editor was endorsing the truth of the appended facts, which asserted that plaintiff was an anti-Semite who employed a single Jewish realtor in order to maintain business with Jewish landlords. Even setting aside the preface referring to the "weekly dose of hate" and the allegations of defendants' efforts to instigate additional attacks against plaintiff's character and business, defendants' attachment of this illustration, if proven, should alone defeat their immunity under the CDA. As the majority concedes, it is well established in federal law that "a website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct" (*Fair Hous. Council of San Fernando Val. v Roommates.Com, LLC* (521 F3d 1157, 1168 [9th Cir 2008]; *see also Federal Trade Commn. v Accusearch Inc.*, 570 F3d 1187, 1199 [10th Cir 2009] ["(A) service provider is 'responsible' for the

development of offensive content only if it in some way specifically encourages development of what is offensive about the content"]).

Like the majority, I accept the "national consensus" on statutory immunity under the CDA (majority op at 288). However, I see no basis in the record for the majority's confident conclusion that defendants served only as a passive conduit of this defamatory material, and are therefore immune as a matter of law. As the majority notes, section 230 of the Communications Decency Act, titled "Protection for private blocking and screening of offensive material," was prompted by the undesirable result in *Stratton Oakmont, Inc. v Prodigy Servs. Co.* (1995 WL 323710, 1995 NY Misc LEXIS 229 [Sup Ct, Nassau County 1995]), where the trial court held a service provider liable in a defamation action based on its voluntary efforts to filter and edit offensive messages posted on its bulletin boards. This editorial activity, the court reasoned, rendered the provider a publisher and thus responsible for libelous content posted on its Web site (*see* 1995 WL 323710 at *4, 1995 NY Misc LEXIS 229 at *10-11).

Concerned that cases like *Stratton Oakmont, Inc.* would discourage providers from censoring offensive content on their own sites, Congress enacted section 230, in part, to insulate providers from liability for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected" (47 USC § 230 [c] [2] [A]). Both houses of Congress stressed that "[o]ne of the specific purposes of this section is to overrule Stratton-Oakmont v. Prodigy and any other similar decisions which have treated such providers and users as publishers or speakers of content that is not their own because they have restricted access to objectionable material" (HR Rep 104-458, 104th Cong, 2d Sess, at 194; S Rep 104-230, 104th Cong, 2d Sess, at 194 [containing same quote]).

While I do not dispute the adoption of a broad approach to immunity for on-line service providers under the CDA, an interpretation that immunizes a business's complicity in defaming a direct competitor takes us so far afield from the purpose of the CDA as to make it unrecognizable. Dismissing this action on the pleadings is not required by the letter of the law and does not honor its spirit.

Judges GRAFFEO, READ and SMITH concur with Judge CIPAR-
ICK; Chief Judge LIPPMAN dissents and votes to reverse in a sep-
arate opinion in which Judges PIGOTT and JONES concur.

Order affirmed, with costs.